**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, vs. RYAN WILLIAM BUCHHEIM, Defendant. | No. 17-CR-84-LRR **SUPPLEMENTAL REPORT AND RECOMMENDATION TO DENY DEFENDANT'S MOTION TO SUPPRESS** |

_____

## I. INTRODUCTION

The matter before the Court is defendant's Motion to Reopen the Suppression Hearing for Further Evidence regarding defendant's Motion to Suppress Evidence. (Doc. 44). Defendant argues that an officer unduly prolonged the traffic stop for the purposes of conducting a canine search of defendant's car, in violation of the Fourth Amendment, citing the Supreme Court's holding in *Rodriguez v. United States*, 135 S. Ct. 1609 (2015). On February 9, 2018, I held a hearing to consider additional evidence on the motion to suppress. For the reasons that follow, I continue to recommend that the Court **deny** defendant's motion to suppress.

## II. PROCEDURAL HISTORY

On October 18, 2017, the grand jury charged defendant in a one-count indictment with Possession with Intent to Distribute Methamphetamine in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), and 851. (Doc. 2). The charge arose from evidence found during a traffic stop of defendant's car on March 16, 2017. On November 28, 2017, defendant filed a motion to suppress evidence from that traffic stop. (Doc. 16). On December 15, 2017, I held a hearing on the motion, at which

Investigator Mitchell Magill and Officer Chris Carton testified. On December 18, 2017, I issued a Report and Recommendation recommending that the Court deny defendant's motion to suppress. (Doc. 28).

On January 12, 2018, defendant filed the instant motion to reopen the evidence, asserting that since the hearing he had discovered new evidence. (Doc. 44). The government resisted the motion to reopen the evidentiary record. (Doc. 46). On January 22, 2018, the Honorable Linda R. Reade, United States District Court Judge, referred the motion to me. (Doc. 47). On January 23, 2018, I entered an order scheduling a hearing on the motion to suppress for February 2, 2018 (Doc. 49), but at defendant's request (Doc. 51) continued the hearing until February 9, 2018. (Doc. 52).

### III. FINDINGS OF FACT

In my first Report and Recommendation, I made factual findings. (Doc. 28, at 2-5). To establish context for the new evidence, I will repeat my factual findings here.

#### A. *Findings from First Hearing*

On the night of March 16, 2017, Cedar Rapids Police Investigator Mitchell Magill was on patrol in an unmarked police car as part of a Mobile Assistance Team, which was tasked with assisting in any crime that required investigation and performing routine patrol duties. At approximately 9:00 PM, Investigator Magill drove by defendant's residence on 18th Avenue SW, in Cedar Rapids. Investigator Magill saw defendant's car parked outside. Although Investigator Magill was aware of tips indicating defendant was involved in distributing methamphetamine, he did not see anything that made him believe that criminal activity was occurring at that time.

Investigator Magill then picked up his partner, Investigator Bryan Garringer; at some point they drove past defendant's house a second time and found that defendant's car was no longer parked at the residence. The investigators observed defendant's car a few minutes later on Wilson Avenue, which was only a short distance from defendant's

residence. The investigators were able to eventually get behind defendant's car as defendant drove down the on-ramp to northbound Interstate 380. The investigators followed in their car.

Over the course of the next few miles Investigator Magill was able to use his trained observation and pacing to estimate defendant's speed. Investigator Magill determined that defendant was exceeding the speed limit by driving 68 miles per hour in a zone with a 55 miles per hour speed limit.[1] When defendant exited the interstate at H Avenue, Investigator Magill initiated a stop of defendant's car by activating the lights on his patrol car. Defendant pulled over in a timely manner. The stop was made a 9:37 PM. Exhibit B.

Investigator Magill got out of his car, approached defendant's car, and engaged in a conversation with defendant. Investigator Magill asked for defendant's driver's license and insurance and asked if defendant knew how fast defendant was driving. Defendant admitted driving 61 miles per hour and acknowledged knowing the speed limit was 55 miles per hour. Investigator Magill looked at the insurance document provided by defendant and saw that it was expired. Defendant looked in his wallet and was able to produce an insurance card that was not expired. Investigator Magill then returned to his police car and, using his onboard computer, checked to determine if defendant's license was valid, whether the car was properly registered, and whether there were any warrants pending for defendant. Investigator Magill verified that defendant's license was valid, the car was properly registered, and there were no pending warrants. Investigator Magill was unable, however, to actually process a speeding citation because his car's computer was not equipped with the necessary program.

---

[1] Investigator Magill's car was not equipped with radar or cameras, nor did he have a body camera or any other recording device on him.

In the meantime, Officer Jacob Briley arrived at the scene as backup. Officer Briley's police car was equipped with a computer program for processing speeding tickets. Investigator Magill used Officer Briley's computer to process defendant's ticket. Investigator Magill logged into the program at 9:40 PM to begin processing the ticket.[2] Exhibit A.

At about the same time Investigator Magill began processing the ticket, Investigator Garringer called for a canine unit to come to the scene to conduct a free-air sniff.[3] In response, Officer Chris Carton arrived at the scene at approximately 9:48 PM. At 9:49 PM, Officer Carton retrieved his canine partner from the car and spoke with Investigator Garringer. Officer Carton then took his canine partner to the front of defendant's car to begin the free-air sniff. Investigator Magill had completed the paperwork in Officer Briley's car at about this same time and asked defendant to step out of his car so that the canine could perform its work. While the canine conducted the free-air sniff, Investigator Magill began to present the citation to defendant, explained it to him, and obtained defendant's signature acknowledging receipt of the ticket.

Meanwhile, Officer Carton started the search, directing his canine from the front of defendant's car along the driver's side of the car. The canine stopped at the driver's side door and indicated the presence of controlled substances. Officer Carton indicated that this occurred within ten to fifteen seconds after he began the search. On the video from Officer Carton's squad car (Exhibit 1), the canine search is not visible (Officer Carton's squad car is parked behind Officer Briley's car, which has flashing lights). I

---

[2] Investigator Magill testified that the program automatically populates the time that appears on the form when the document is opened to begin the processing of the ticket.

[3] This time is based on the testimony of Officer Carton, which was based on Officer Carton's report of when he received the call from dispatch. As such, the call from Investigator Garringer to dispatch may have occurred shortly before Officer Carton received directions from dispatch to go to the scene.

4

could hear what sounded like Investigator Magill discussing the ticket with defendant at approximately 9:50 PM. At approximately 9:51 PM, Officer Carton returned his canine partner to his squad car. Investigator Magill testified that he was advised of the positive indication by the canine by another officer while Investigator Magill was still in the process of issuing the speeding ticket to defendant.

Officer Carton testified that the canine's indication of the presence of controlled substances gave him probable cause to search defendant's car. He and other officers proceeded to search defendant's car. Officers found packages of methamphetamine in the trunk. Based on the evidence from the traffic stop, officers obtained a search warrant for defendant's residence. Additional incriminating evidence was found at defendant's residence.

At the hearing, Investigator Magill testified that he had been a law enforcement officer for ten years and an investigator for nine months. During his time as an investigator, Investigator Magill had processed only two or three speeding tickets, but previously processed many more as a patrol officer. When asked if he had processed more than one hundred, Investigator Magill testified that he could not estimate how many tickets he has written in the past. Investigator Magill testified that it typically takes fifteen to twenty minutes to issue a speeding ticket, especially when, as here, he lacked the software on his computer and had to wait for another officer to arrive at the scene. Investigator Magill testified that the canine search did not delay his issuance of the speeding ticket in any way and that he did not intentionally delay issuing the speeding ticket in order to allow time for the canine search.

### B. *Findings from Second Hearing*

At the second hearing, the evidence focused on the citation (Exhibit A) and the times indicated on that citation. Investigator Magill testified again at the second hearing. He testified that his testimony in the first hearing was mistaken. Investigator Magill

explained that, after the first hearing, he learned that another time stamp appeared on the citation and that the 9:40 PM time did not reflect when he opened the program to write the citation.

### *1. Another Time Entry*

At the prior hearing, Investigator Magill testified that the date and time in the body of the citation auto-populated when an officer opens the TRACS program[4] to begin writing the citation. That date and time entry is part of a sentence, which reads: "The undersigned states that on or about 3/16/17 at 9:40 PM defendant did unlawfully: Operate Motor Vehicle/Boat." (Doc. 27-1). At the second hearing, Investigator Magill reaffirmed that the date and time in that space does auto-populate (which was confirmed by the testimony of Officer Carton). In the first hearing, Investigator Magill testified that he did not see any other time reference on the citation:

> Q. Okay. Now, Investigator, correct me if I'm wrong; I don't see any other reference on the citation to the time of the event. I see a date and a time for a court appearance, but I don't see any other reference to time, except about two-thirds down or three-fourths down the face of this exhibit, the same line is repeated again.
>
> A. Correct.
>
> Q. Would you agree with me?
>
> A. Yes.

(Tr. 29:19-30:2).

Investigator Magill testified at the second hearing, however, that he later discovered there was another reference to the time of the event on the citation. He

---

[4] The computer program used to issue citations is referred to as TRACS. I admitted defendant's Exhibit D, which is a printout regarding the program. Other than identifying the name of the program, I found no evidentiary value in Exhibit D, nor did defendant identify its evidentiary value.

6

testified that the date and time are incorporated as part of the citation number. In the upper-right corner of the document is the entry: "Citation #: 135 1005 170316 214406 5."[5] None of the witnesses could explain what all of the numbers meant, but they did testify that "1005" is Investigator Magill's PIN (or badge) number, that "170316" stands for March 16, 2017, and that "214406" is a time reference to 9:44.06 PM. Testimony from Investigator Magill and Carton established that this number is auto-populated when an officer opens the TRACS program to write a citation and cannot be changed, unlike the other date and time reference.

Therefore, Investigator Magill opened the TRACS program to start writing the citation at 9:44 PM, not at 9:40 PM as Investigator Magill testified at the first hearing.

### *2. The Conflict Between 9:40 PM and 9:44 PM*

At the first hearing, Investigator Magill testified that the reference to the date and time in the body of the citation auto-populates when an officer opens the TRACS program to start writing the citation. At the second hearing, Investigator Magill reaffirmed that the date and time in that space does auto-populate (which was also confirmed by the testimony of Officer Carton). Investigator Magill testified that only the law enforcement officer issuing the citation is able to modify the auto-populated date and time. Investigator Magill was the only person operating the TRACS program and thus concluded that he must have made the change, although he had no recollection of doing so. He testified that an officer would sometimes change the date and time to more accurately reflect when the offense took place. Officer Carton corroborated this practice. The testimony established that the other time stamp that constitutes part of the Citation Number cannot be altered by the issuing officer.

---

[5] The citation number is repeated about two-thirds of the way down the page.

### *3. Factual Conclusions*

I find that Investigator Magill testified truthfully, to the best of his knowledge and understanding, in both hearings. I base that finding on my observations of Investigator Magill and his demeanor while testifying, and upon the other evidence (all of which corroborates him). I also base that finding on a lack of motive for Investigator Magill to falsify the citation.

Investigator Magill testified that the Cedar Rapids Police Department began using the TRACS program about five years ago and, given his duties, he has not used the TRACS program often. Over the course of the past year, Investigator Magill wrote only three citations. I believe Investigator Magill honestly did not realize there was another time reference on the citation. I find Investigator Magill honestly testified that the other date and time reference in the body of the citation did auto-populate, and that he simply did not recall changing the time to 9:40 PM from 9:44 PM. It makes sense that he would change the time to more accurately reflect the time of the offense. In this case, the stop began at approximately 9:38 PM. Further, Investigator Magill's failure to remember changing the time nearly one year after the traffic stop actually occurred, does not strike me as suspicious.

Investigator Magill could not begin writing the citation until Officer Briley arrived with a squad car equipped for writing citations. It appears that Officer Briley arrived at 9:40:45 PM. It would logically take Investigator Magill a few minutes to explain the situation to Officer Briley and get into Officer Briley's car to open up the TRACS program to write the citation. Investigator Magill, we now know, opened the program at 9:44:06 PM. After the first hearing, I concluded that Officer Carton arrived with his drug dog four minutes later, at 9:48 PM. At approximately 9:50.35, Investigator Magill can be heard discussing the ticket with defendant. During the first hearing, it was established that Investigator Magill was discussing the ticket with defendant at the same

8

time the dog was indicating the presence of a controlled substance in defendant's car. A duration of six minutes to write a speeding citation is reasonable and does not suggest an intentional delay. Indeed, on cross examination at the second hearing, Officer Carton testified that it usually takes approximately six to eight minutes to write a citation using the TRACS program.

Investigator Magill's adjustment of the time of the alleged offense to 9:40 PM more accurately reflects the time of the offense than the auto-populated time of 9:44 PM. Moreover, there would be no reason for Investigator Magill to enter a false time, or to enter a time earlier than 9:44 PM in an effort to somehow conceal wrongful conduct. Even if Investigator Magill anticipated having to defend the length of time it took him to issue a traffic citation, the later in time he began writing the citation, the more reasonable the delay between completing the traffic stop and the dog sniff would be. In other words, if Investigator Magill had altered the timestamp to justify a lengthier traffic stop, he would have entered a time later than 9:44 PM, not earlier.

During the second hearing, defendant presented lengthy testimony from Investigator Magill and civilian Cedar Rapids Police Department employee, Joseph McCarville regarding dispatch records regarding this traffic stop. Mr. McCarville manages the dispatch operations for the Cedar Rapids Police Department. Defendant offered Exhibit C into evidence without objection. Exhibit C is a printout of the dispatch communications related to this incident. The import of these entries centered around Investigator Magill's testimony that some of the time during the traffic stop was consumed by verifying defendant's criminal history and determining whether there were pending warrants on defendant.

Exhibit C does not show Investigator Magill checking defendant's criminal history. Indeed, it does not show any communication at all between Investigator Magill and dispatch. The reason for this was easily and convincingly explained at the hearing.

Investigator Magill was riding in the same unmarked car with Investigator Garringer. Only one of them could log into their car's computer, and in this case, Investigator Garringer did so. Any communication between that car and dispatch, therefore, would reflect communication with Investigator Garringer. Investigator Garringer's unit number is reflected in the dispatch communication. (Compare Exhibit C and Exhibit 1). Moreover, the absence of any dispatch record reflecting Investigator Magill's request to run a check on outstanding warrants for defendant or to run his criminal history was also explained. Both Investigator Magill and Officer Carton testified that they normally check that information through other sources and not through dispatch.

At the hearing, defendant suggested that Investigator Magill delayed the issuance of the citation by checking on warrants and defendant's criminal history by accessing the National Crime Information Center and state databases instead of using the TRACS program. The TRACS program is equipped with a bar code reader that allows officers to scan a driver's license. The TRACS program will apparently then run a criminal records check on the driver without the officer being required to manually enter the driver's information. Investigator Magill and Officer Carton testified in the second hearing that the bar reader does not always work. All three witnesses testified in the second hearing that using the TRACS program is not necessarily faster than running criminal history checks through other databases, and, in some cases, may be slower.

Finally, defendant implied during the hearing that there was something suspect about the fact that it appears on the dispatch records that Officer Briley was checking with dispatch about the license plate on defendant's car at a time when Investigator Magill was supposedly on Officer Briley's computer drafting the citation. There is nothing suspect about this. Investigator Magill testified that in the process of writing the citation, he had to access information about defendant's vehicle. He did so on Officer Briley's computer. The dispatch records would necessarily reflect that the communication

10

appeared to come from Officer Briley because it was done on his computer. The person operating a computer is not necessarily the same person who logged onto the computer in the first instance. In any event, the issue is irrelevant. Even if Officer Briley interrupted Investigator Magill's drafting of the citation to run the plates on defendant's car that would have been a legitimate law enforcement inquiry during a traffic stop. There is no suggestion, let alone evidence, that running the plates was a ploy to delay the length of the traffic stop to allow time for the drug dog to appear.

In short, I reaffirm my factual findings from my first Report and Recommendation that Investigator Magill diligently pursued the purpose of the traffic stop—that is, the issuance of a speeding citation. I further find that the canine search did not unreasonably delay the issuance of that speeding citation. Indeed, I find that the canine search had no impact whatsoever on Investigator Magill's processing of the speeding citation.

### IV. CONCLUSION

Therefore, for the reasons set forth above, I continue to respectfully recommend that the Court **deny** defendant's Motion to Suppress.

Objections to this Report and Recommendation in accordance with 28 U.S.C. § 636(b)(1) and FED. R. CRIM. P. 59(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* FED. R. CRIM. P. 59. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**IT IS SO ORDERED** this 13th day of February, 2018.

_____
C.J. Williams
Chief United States Magistrate Judge
Northern District of Iowa